## BOARD OF COUNTY COMMISSIONERS V. N.M. TAXATION AND REVENUE

This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**BOARD OF COUNTY COMMISSIONERS, HARDING COUNTY; MOSQUERO MUNICIPAL SCHOOLS, BOARD OF EDUCATION; and ROY MUNICIPAL SCHOOLS, BOARD OF EDUCATION,**
**Petitioners-Appellees,**
**v.**
**NEW MEXICO TAXATION AND REVENUE DEPARTMENT and DEMESIA PADILLA, Secretary of the New Mexico Taxation and Revenue Department,**
**Respondents-Appellants.**

Docket No. A-1-CA-36305
COURT OF APPEALS OF NEW MEXICO
May 24, 2019

APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY, Francis J. Mathew, District Judge

### COUNSEL

Gallegos Law Firm, P.C., J.E. Gallegos, Michael J. Condon, Santa Fe, NM or Appellees

Hector H. Balderas, Attorney General, David E. Mittle, Special Assistant Attorney General, Santa Fe, NM for Appellants.

### JUDGES

KRISTINA BOGARDUS, Judge. WE CONCUR: LINDA M. VANZI, Judge JACQUELINE R. MEDINA, Judge

**AUTHOR:** KRISTINA BOGARDUS

### MEMORANDUM OPINION

**BOGARDUS, Judge.**

**{1}** The New Mexico Taxation and Revenue Department (the Department) and the Department secretary, Respondents, appeal the following district court orders, all granted in favor of Petitioners, the Board of County Commissioners of Harding County,

the Board of Education of Mosquero Municipal Schools, and the Board of Education of Roy Municipal Schools (collectively, Harding County): (1) Corrected Peremptory Writ of Mandamus (Peremptory Writ); (2) Order on Show Cause Proceeding (Contempt Order); and (3) Opinion and Order on Petitioners' Application for Fees and Costs (Order for Fees and Costs).[1] We conclude that the appeal of the Peremptory Writ is untimely and dismiss that appeal. We affirm the remaining orders.

## BACKGROUND

**{2}** This appeal stems from Harding County's repeated requests for the Department to value certain property located in the county so that property tax could be assessed. If assessed, Harding County would receive a portion of the tax collected on the property, which consists of two high-voltage electric transmission lines and related facilities: the "Hess line," and the "Whiting line." Springer Electric Cooperative, Inc. (Springer) owns the Hess line, which has been in place since 2009. Ownership of the Whiting line, which was constructed in 2013, was uncertain when Harding County first took action against the Department, but it was later determined that Springer was the owner.

**{3}** Harding County made the requests of and took action against the Department because the Department plays a central role in the taxation of such properties. By law, the Department values properties "used for the generation, transmission or distribution of electric property or energy" according to a special method established by NMSA 1978, Section 7-36-29(A) (2016). Each year, the owner of such property must send its own assessment of the property's value to the Department. *See* NMSA 1978, § 7-38-8 (2007). The Department then must send a notice to the owner-taxpayer informing it of the amount it deems the net taxable value of the property. *See* NMSA 1978, § 7-38-20(B) (2012). A taxpayer may protest the Department's valuation. *See* NMSA 1978, § 7-38-39 (1983).

**{4}** Harding County first tried to have property tax revenue generated from the lines in 2009, when it asked the Department to issue Springer a notice of valuation for the Hess line. The Department did not respond to that or subsequent such requests until 2012. In 2012 a Department staff attorney drafted a memo to the Department secretary and others concluding that the line, a so-called "contribution in aid of construction" (CIAC)[2] property, was taxable—and that state law did not recognize a tax exemption for such property. Also that year, the Department sent Springer a notice of valuation of the Hess line. The Department had based its valuation on a figure reported by the Tri-State corporation (Tri-State), which had paid for some or all of the line's construction.

---

1The Department states in its brief in chief that it is also appealing the order denying motion for reconsideration of the order on show cause, but it does not further discuss that order. We likewise will not address it.

2According to the staff attorney's memo, "[CIAC] is a financing mechanism that enables capital costs for expansion of services by a variety of public utilities[,] . . . was introduced by The [federal] Tax Reform Act of 1976 as a new category of nontaxable, non-shareholder contributions to capital, [and] is an inducement of sorts for utilities to build and often extend the [utility infrastructure] system" with the customer sharing in the cost. (Footnote omitted.)

**{5}** Despite the initial 2012 valuation and similar valuations for each of the years from 2013 through 2015, no property tax revenue resulted from the Hess or Whiting lines. That is because Springer protested the Hess line valuation for each of those years, and both Springer and the Department exercised their statutory rights to waive indefinitely the requirement that the protest be resolved within 120 days. The waivers were in effect until the Department scheduled a protest hearing on the matter after this lawsuit was filed. Meanwhile, the Whiting line's owner was unknown throughout much of the period at issue, and so the line could not be taxed.

## I.     Writ Proceedings

**{6}** In May 2015 Harding County petitioned the district court to compel the Department to value the lines for property tax purposes and to resolve protests related to the Hess line. The district court granted the petition and issued an alternative writ of mandamus against the Department. Instead of immediately complying with the alternative writ, the Department elected—as the writ allowed—to show cause why the Department did not perform the duties ordered by the writ. The Department argued that (1) it had already complied with the writ by having valued the property at issue, (2) the writ was improvidently granted, and (3) the writ was legally insufficient. The Department requested that the district court (1) find that it had performed the duties ordered by the writ, (2) quash the writ, or (3) delay issuing a peremptory writ until the property's final values were established through an Administrative Hearings Office (AHO) tax-protest hearing.

**{7}** Not persuaded by the Department's arguments, the district court issued the Peremptory Writ, which included findings, conclusions, and orders; those relevant to this appeal are summarized as follows. The district court found that (1) the Department had not valued the Hess line for property tax purposes for the years from 2009 through 2011, but did value that line beginning in 2012 using a construction-cost-based amount reported by Tri-State; (2) the Department had "done nothing to conclude" Springer's protests of those 2012 through 2015 valuations; (3) the Whiting line, which appeared to the Harding County assessor to be owned by Springer, was constructed in 2013 and had not been valued by the Department for property tax purposes; and (4) as a result, Harding County could not collect property tax on the lines for any of the years of their existence.

**{8}** The district court concluded that (1) the Department was required by law to perform valuations of the Hess and Whiting lines and to report the values to Harding County; (2) no constitutional or statutory exemption from property tax applied to the lines, let alone under a CIAC "theory"; and (3) the Department's waiver of the 120-day requirement in connection with Springer's protests did not permit unlimited delay in resolving them.

**{9}** Lastly, the district court ordered the Department to (1) promptly issue notices of valuation, determined in accordance with Section 7-36-29 (2015), of the Hess line for the years 2009 through 2011; (2) present the writ's rulings on taxability of the Hess line

to the hearing officer assigned to conduct the hearing on Springer's 2012 through 2015 valuation protests; (3) upon issuance of the hearing officer's decision, certify to the Harding County assessor the final valuations of the Hess line for those years; (4) immediately investigate the ownership and construction of the Whiting line and, once ownership was confirmed, value the line in accordance with Section 7-36-29 (2015) and certify the valuation to the Harding County assessor; and (5) complete those actions, and report to the district court on that completion, within 180 days—that is, on or before April 27, 2016.

## II.     Department's Response to Peremptory Writ

**{10}**     Four days after the final writ hearing, the Department requested an AHO hearing on Springer's 2012 through 2015 valuation protests. On January 5, 2016, the AHO continued the hearing at Springer's request and rescheduled it for January 27, 2016. At the end of the January 27 hearing, the hearing officer ordered the parties to submit proposed findings of fact and conclusions of law within two weeks. The parties asked for and were granted an extension until the end of the legislative session. Then, on February 19, 2016, Springer moved to reopen the AHO record to submit evidence of recent legislative action relevant to the matter. The hearing officer agreed and took administrative notice of that action, described as follows.

**{11}**     During the 2016 legislative session, Section 7-36-29 (2015) was amended to include an exception to the definition of "tangible property cost," which is the basis for determining the value of property subject to Section 7-36-29's special method of valuation. *See* S.B. 47, 52nd Leg., 2nd Sess. (N.M. 2016), *available at* https://nmlegis.gov/Sessions/16%20Regular/final/SB0047.pdf. Specifically, the following language was added to the statute: " 'tangible property cost' . . . excludes the cost of property contributed to, or acquired with funds contributed to, a utility by or on behalf of a ratepayer or potential ratepayer for the expansion, improvement or replacement of property used for the transmission or distribution of electric power of the utility." *Compare* § 7-36-29(B)(7) (2015), *with* § 7-36-29(B)(6) (2016). In other words, according to the revised statute, property subject to Section 7-36-29 that falls under the exception is not "tangible property" and thus has no taxable value. *See* § 7-26-29 (2016).

**{12}**     Having taken administrative notice of the statute's amendment, the hearing officer ruled in Springer's favor by concluding in his March 26, 2016, decision and order (AHO Decision) that "the tangible property cost valuation of the Hess line for purposes of Section 7-36-29 is zero."

**{13}**     To reach this conclusion, the hearing officer found that (1) the Hess line's construction was paid for entirely by the Tri-State and Hess corporations "as a contribution in aid of construction"; (2) Springer took ownership of the line once its construction was complete, and Springer's actual construction cost, acquisition cost, or both was zero; (3) since at least 1984, the Department's reporting forms and related instructions for electric utilities have required compliance with federal accounting rules that "require the exclusion of property acquired by [CIAC] from property valuation"; (4)

Springer had been completing those forms and reporting valuation of the line in accordance with those rules; (5) the parties stipulated that the Department had not assessed CIAC property in the past; and (6) Section 7-36-29 (2015) recently had been amended "to expressly exclude [CIAC property] from 'tangible property cost'."

**{14}** The hearing officer reasoned that (1) the Department's non-assessment of CIAC property value, which corresponded to the federal rules, and its plan to continue that non-assessment made clear that the cost of CIAC property was excluded from the definition of "tangible property cost"; (2) "[p]ersuasive weight [was] to be given to the long-standing administrative construction of statutes"; (3) the Legislature was presumed to know and acquiesce to that longstanding interpretation; and (4) the Legislature had amended the statute in response to the Department's "recent attempt to assess value" on CIAC property.

**{15}** On April 21, 2016, the Department filed "Respondents' Certificate of Compliance with the October 27, 2015[,] Peremptory Writ of Mandamus" (Certificate of Compliance) with the district court. In it, the Department stated the following: (1) the AHO hearing occurred, and the AHO Decision (attached to the certificate) was issued; (2) the decision "resulted in no notices of valuation for years 2009-2011 because there is no value to the electric lines at issue for those tax years"; (3) the Department determined that Springer owned the Whiting line; and (4) "[t]he AHO decision on the Hess Line involves the same parties and issues as the Whiting Line" and so the Department "is not issuing omitted assessments valuing the Whiting Line because it did not and does not have any value as set forth in the AHO decision."

### III. Show-Cause Hearing and District Court's Contempt Finding

**{16}** Harding County responded by moving for an order requiring that the Department show cause why it should not be held in contempt of court for failure to comply with the Peremptory Writ. Following a hearing on the matter, the district court entered the Contempt Order. It included findings of fact and conclusions of law and highlighted flaws in the Department's compliance with the writ, flaws in the AHO Decision's reasoning, and flaws in the assertion that deference should be given to the AHO Decision.

**{17}** The district court's findings are summarized as follows. First, the Department had not, before the deadline set out in the writ (1) valued the Whiting line for 2013 through 2015, nor certified those valuations to the Harding County assessor; (2) valued the Hess line for 2009 through 2011, nor certified those valuations to the assessor; or (3) certified the 2012 through 2015 valuations of the Hess line to the assessor. Second, the amendment to Section 7-36-29 (1) became effective on July 1, 2016; (2) was "irrelevant" to electric plant property valuation for 2009 through 2015; and (3) even assuming it was legally valid, applied to payments by a rate payer, which Tri-State was not. Third, the Department had "willfully and intentionally refused to perform the duties and obligations required of [it] by law and by the final and binding terms of the Writ."

**{18}** The district court then concluded that (1) application of the separation of powers principle preserved the Peremptory Writ from interference by the Legislature or an executive-branch hearing officer; (2) the AHO Decision "has no materiality" to the Hess line valuations for 2009 through 2011 or to the Whiting line for any year; and (3) the AHO Decision "affords [the Department] no relief from [its] obligations imposed by law and by the Writ."

**{19}** Lastly, the district court held the Department in willful contempt of court and ordered it to (1) pay Harding County's attorney fees and expenses in the prosecution of the show-cause proceeding; (2) "fully and effectively" comply with the Peremptory Writ, including by certifying notices of valuation of the Hess and Whiting lines to the assessor for the years of the lines' presence in the county; and (3) "do all things and acts necessary to enable the assessment and collection of the subject property taxes from Springer."

## IV. Post-Contempt Order Motions

**{20}** Shortly after the Contempt Order was filed, Harding County filed a verified application for fees and costs. The Department then moved for reconsideration of the Contempt Order. The district court held a hearing on that matter and denied the motion. The district court then issued the order for fees and costs incurred in the prosecution of the show-cause proceeding. This appeal followed.

## DISCUSSION

## I. The Appeal of the Peremptory Writ Is Untimely

**{21}** Harding County contends that the Department's appeal of the Peremptory Writ is untimely. The writ was entered on October 27, 2015, and notice of appeal was filed on March 9, 2017. The Department, evidently conceding that it missed the deadline to appeal the writ, argues that "judicial economy and efficiency is served" by our review of it.

**{22}** We agree with Harding County that the appeal is untimely. NMSA 1978, Section 44-2-14 (1899) provides that the rules for appealing a final judgment by a court in a mandamus proceeding mirror those applicable to such judgments in other civil cases. The rules governing civil cases are in NMSA 1978, Section 39-3-2 (1966) and Rule 12-201 NMRA. They require that a party appealing a district court's final order file the appeal within thirty days after the district court enters the order. *See* § 39-3-2; *see also* Rule 12-201(A)(1)(b). The Peremptory Writ is such an order. *See Hoyt v. State*, 2015-NMCA-108, ¶ 16, 359 P.3d 147 ("[I]ssuance of a peremptory writ is the final step in all mandamus proceedings . . . and the final order that must be appealed to a higher court."). Having appealed the Peremptory Writ more than seventeen months after it was issued, the appeal is untimely.

**{23}** The Department wishes that we nonetheless hear the appeal to advance judicial economy and efficiency, but fails to explain how entertaining its appeal on the writ would further these principles. We therefore decline to entertain the argument. *See Corona v. Corona*, 2014-NMCA-071, ¶ 28, 329 P.3d 701 ("This Court has no duty to review an argument that is not adequately developed.").

**{24}** We conclude that the Department's failure to timely appeal the Peremptory Writ deprives us of jurisdiction to consider its merits. The only ground on which we could vacate the writ is the district court's lack of jurisdiction to have issued it. *See* 55 C.J.S. *Mandamus* § 443 (2009) ("The rule of res judicata applies to . . . the peremptory writ itself, and, *apart from matters of jurisdiction*, all questions raised or which could have been raised in opposition to granting the writ are conclusively determined by issuance of the writ and may not be raised again in resisting obedience or to justify disobedience." (emphasis added) (footnotes omitted)). Such jurisdiction is not at issue. *See* NMSA 1978, §§ 44-2-3, -4 (providing that a district court has exclusive original jurisdiction in all cases of mandamus to compel the performance of an act the law requires be performed by an officeholder). Accordingly, we do not reach the Department's claims pertaining to the writ's merits.

**{25}** Rather, we address only those issues relating to the Contempt Order and the Order for Fees and Costs, which the Department timely appealed.

## II. The Contempt Ruling Was Proper

**{26}** The Contempt Order stated that the Department (1) is "in willful contempt of [c]ourt and [has] failed to show cause to the contrary"; and (2) "shall pay the [p]etitioners' attorney fees and expenses in the prosecution of th[e] show cause proceeding." The district court, through the order, held the Department in civil contempt and imposed compensatory sanctions on it. *See State of N.M. ex rel. Children, Youth & Families Dep't v. Mercer-Smith*, 2019-NMSC-005, ¶ 20, 434 P.3d 930 (noting that the purpose of civil contempt, as distinguished from criminal contempt, is to "preserve and enforce the rights of private parties to suits and to compel obedience to the orders, writs, mandates and decrees of the court" (internal quotation marks and citation omitted)); *id.* ¶ 22 ("Compensatory sanctions . . . are imposed for the purpose of compensating a party for pecuniary losses sustained due to the contempt." (internal quotation marks and citations omitted)).

**{27}** The Department argues it was not in contempt because it attempted to comply with the Peremptory Writ by (1) in each of the years from 2012 through 2015, issuing notices of valuation to Springer; (2) participating in the AHO hearing; and (3) attaching to the Certificate of Compliance a copy of the AHO Decision. The Department then restates the explanation it offered in the certificate: essentially, that the AHO Decision foreclosed the need to issue notices of valuation for each of the years from 2009 to 2011 because the decision deemed the electric lines valueless. Lastly, the Department argues that it had no control over the outcome of the AHO hearing, that it was held "in contempt for the actions of others"—referring, presumably, to the actions of the AHO

officer and Springer—and that "[t]here is no evidence of willful noncompliance." In essence, the Department's position is that, given the change of circumstances caused by the AHO Decision, its good-faith efforts at complying with the writ were sufficient to preclude a contempt ruling.

**{28}** Harding County counters that evidence in the record amply supports the ruling. It argues that the Department did not take steps toward compliance with the Peremptory Writ it could have taken, namely: (1) certify the previously determined $13 million value to the Harding County assessor; (2) ask the AHO to reconsider its decision; (3) appeal the AHO decision to this Court as provided by NMSA 1978, Section 7-1-25 (2015); and (4) ask the district court for clarification of or guidance on its obligations under the writ. Harding County argues the contempt ruling was proper because the Department took none of these steps and because the AHO Decision does not shield the Department from its obligation to comply with the writ. Harding County goes on to highlight flaws in the AHO Decision's factual findings and legal conclusions.

## A.    Standard of Review and Requirements for the Contempt Finding

**{29}** We review the district court's contempt ruling for an abuse of discretion. *State ex rel. Udall v. Wimberly*, 1994-NMCA-121, ¶ 15, 118 N.M. 627, 884 P.2d 518. Such an abuse occurs when the ruling is "clearly against the logic and effect of the facts and circumstances of the case or is based on a misunderstanding of the law." *Tue Thi Tran v. Bennett*, 2018-NMSC-009, ¶ 30, 411 P.3d 345 (internal quotation marks and citation omitted). We defer to the court's factual findings, drawing all reasonable inferences in the light most favorable to those findings, but consider the application of those facts to the law de novo. *Allred v. N.M. Dep't of Transp.*, 2017-NMCA-019, ¶ 57, 388 P.3d 998.

**{30}** We clarify at the outset that intent is not, as the Department asserts, an element of civil contempt. *State v. Rivera*, 1998-NMSC-024, ¶ 13, 125 N.M. 532, 964 P.2d 93. The elements of "civil contempt are: (1) knowledge of the court's order, and (2) an ability to comply." *Tran*, 2018-NMSC-009, ¶ 35 . Undisputedly, the Department had knowledge of the writ. Therefore, the Department's ability to comply with the writ is the key question bearing on whether the contempt ruling was proper. The Department has the burden of proof concerning that inability. *See Allred*, 2017-NMCA-019, ¶ 60. That burden extends to proving not only that it was impossible to comply, but also that the Department did not create the impossibility. *See id.* If the Department cannot prove that it did not create the impossibility, then the defense of impossibility is unavailable. *See Spear v. McDermott*, 1996-NMCA-048, ¶ 30, 121 N.M. 609, 916 P.2d 228 (establishing that a contemnor's genuine inability to comply with a court order is not a defense to compensatory sanctions when the inability was self-created).

## B.    Department Compliance With the Peremptory Writ's Orders

**{31}** We next examine the Department's actions in response to the Peremptory Writ and consider whether they constitute a sufficient exercise of its ability to comply. As a preliminary matter, we dismiss the Department's argument that the 2012 through 2015

notices of valuation to Springer of the Hess line show compliance. Given that the notices were issued before the writ was entered, the acts of issuing them could not have constituted steps toward compliance.

{32}   The Peremptory Writ instead ordered the Department to take actions it could have taken, but did not take. Namely, the Department was to issue notices of valuation of the Hess line for 2009 through 2011 and those of the Whiting line for 2013 through 2015. The Hess line valuations were to be made "promptly," and the Whiting line valuations, "upon confirming ownership." Investigation into that ownership was to begin "immediately." The writ further ordered the Department to make particular certifications. The Department was to certify to the Harding County assessor the 2012 through 2015 valuations of the Hess line "[u]pon issuance of the hearing officer's decision" and also certify to the assessor the Department's valuations of the Whiting line. Through its failure to issue these notices of valuation within the specified time frames—showing whatever amounts the Department treated the lines as having—and its failure to make these certifications, the Department failed to comply with the writ.

## 1.     The Department's Assumptions Were Improper

{33}   The Department made two improper assumptions that contributed to its failure to comply with the Peremptory Writ: (1) that the unissued notices were unnecessary in light of the AHO Decision; and (2) that it should postpone issuing the 2009 through 2011 Hess line notices of valuation.

{34}   Regarding the first assumption—that the 2009 through 2011 notices of valuation of the Hess line were unnecessary—we note that the AHO decision did not address those years' valuations. Having not been adjudicated, the values were not formally established; that void presented an opportunity for the Department to attempt to fulfill its obligations under the writ by rearguing the legal matter of the line's taxability. Perhaps the Department saw little chance of persuading Springer or, under protest, the AHO, of adopting a legal interpretation different from that applied to the 2012 through 2015 valuations. But such persistence would have constituted effort toward compliance.

{35}   Also regarding the first assumption, we note that the AHO decision did not address the Whiting line. The Department reasoned that the Whiting line had a zero value because the decision gave the Hess line a zero value for certain years. Implicit in that reasoning are additional assumptions that (1) Springer would have protested the value of the Whiting line if the Department had, in an effort to comply with the writ, valued the line as though it fell within the definition of "tangible property cost" and accordingly had a positive value; and (2) had Springer protested that Department-determined value, the AHO would have decided that the line had no value. In our view, these assumptions were unreasonable given that the Department was under a court order to do its part to generate property tax revenue from the Whiting line.

{36}   Nor are we persuaded that it was appropriate for the Department to assume it proper to defer issuing the 2009 through 2011 Hess line notices of valuation. Perhaps

the Department decided to do so in order to extrapolate the line's values for the earlier years from the AHO Decision—but the Peremptory Writ ordered that the notices be issued "promptly." As illustrated by the part of the writ ordering 2012 through 2015 Hess line certifications, which instructed the Department to certify after the AHO Decision was issued, the district court could have, but did not, authorize such a delay for the notices. The Department took it upon itself to delay issuing them and thereby improperly substituted its plan for that established by the district court. *Cf. In re State ex. Rel. Children, Youth & Families Dep't*, 2015-NMCA-093, ¶ 14, 356 P.3d 26 (remarking that "it does not lie in the contemnors' mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined" and that "[s]uch a rule would give tremendous impetus to a program of experimentation with disobedience of the law" (alterations, internal quotation marks, and citation omitted)), *rev'd and vacated*, 2019-NMSC-005, 434 P.3d 930.

## 2. The Department's Failures Were Improper

**{37}** In making these assumptions and not seeking clarification from the district court that they were proper, the Department exposed itself to risk of disobeying the Peremptory Writ. *Cf. Children, Youth & Families Dep't*, 2015-NMCA-093, ¶ 14 (noting that "parties subject to an order have an obligation to seek clarification from the district court if they do not understand the court's order" and that "[w]hen parties instead undertake to make their own determination of what a decree means, they act at their peril" (alterations, internal quotation marks and citation omitted)). In so doing, the Department in effect ignored the writ—and did so at its peril. *See State v. Bailey*, 1994-NMCA-107, ¶ 11, 118 N.M. 466, 882 P.2d 57 (commenting that the defendant who violated an injunction "did not have the right simply to ignore the court's ruling; in effect, to become his own judge and jury").

**{38}** We recognize that the Department's failure to comply to the best of its ability with the Peremptory Writ was due, in part, to the adverse AHO Decision. On the one hand, the writ made clear that the district court interpreted the law to necessarily impart a taxable value on the Hess and Whiting lines. On the other, the hearing officer interpreted the law to impart no taxable value on the Hess line for certain years. At that juncture, the Department faced a dilemma. The Department was under a court order whose purpose was to generate property tax revenue for Harding County, but its ability to assess the tax was impeded by the AHO's no-value determination.

**{39}** The Department had at least two options to resolve the dilemma: (1) notify the district court of its perceived impediments to assessing property tax on the lines, *see In re Hooker*, 1980-NMSC-109, ¶ 4, 94 N.M. 798, 617 P.2d 1313 (remarking that the contemnor, who was impeded from appearing at hearing due to military service, should have notified the court of the impediment); or (2) exercise its statutory power to appeal the AHO Decision within thirty days of its issuance. *See* § 7-1-25(A) ("If the protestant or the [Department] secretary is dissatisfied with the decision and order of the [AHO] hearing officer, the party may appeal to the court of appeals for further relief[.]"). Insofar as the Department maintains that it did not have a statutory right to appeal the AHO

Decision, [**RB 3**] we note that ignorance of the law is generally no excuse in a contempt charge, *see* 17 C.J.S. *Contempt* § 67 (2011), and ignorance of this particular statute is particularly inexcusable considering the central role it plays with respect to the Department. In any case, the Department exercised neither of these options.

**{40}** The Department's failure to appeal the AHO Decision contributed to the change of conditions that interfered with the compliance expected by the district court when it issued the Peremptory Writ. That failure, as well as the Department's failure to notify the court of its perceived difficulties assessing the lines, preclude relief from the contempt ruling. *See Spear*, 1996-NMCA-048, ¶¶ 32, 36, 51 (recognizing that "the mere existence of a contrary court order is not a defense to a contempt action for failing to obey a court order").

**{41}** In sum, the Department fails to meet its burden to prove that it acted to the extent possible to comply with the Peremptory Writ and that it did not contribute to the circumstances interfering with that ability. Accordingly, the district court did not abuse its discretion by holding the Department in contempt for failure to comply with the writ.

## III.   The Award of Attorney Fees and Costs Was Proper

**{42}** We consider next whether the district court's award of attorney fees and costs was proper. The district court awarded Harding County $38,430.53, an amount representing attorney fees of $34,531.50, costs of $997.42, and gross receipts tax of $2,901.61 incurred in the prosecution of the contempt proceeding. The court found that "the particular hourly rates and hours set out in the application are reasonable."

**{43}** The Department asserts that the district court abused its discretion by ordering the Department to pay $34,531.50, which it characterizes as an unreasonable amount, in attorney fees, plus costs and tax. It argues both that any award in the matter would be unreasonable and unjust and that the particular amount is unreasonable and unjust. The Department specifically asserts that the amount is too high in relation to the level of difficulty in preparing the motion to show cause. It adds that counsel for Harding County was unsuccessful in obtaining relief for his client and should have tried to have the AHO Decision reversed. It further complains that the court (1) did not consider factors required to be considered in determining reasonableness of fees, (2) rejected a lodestar modification, and (3) stated in the Order for Fees and Costs that the Department had "proceeded at its own peril knowing counsel charged high hourly rates."

**{44}** Harding County counters that the award was proper because the district court deemed the hours and rates reasonable and because the award was made in an amount representing the hourly rates charged other clients. The county argues that the Department (1) applied the wrong standard for determining the propriety of an award of attorney fees in a contempt sanction, (2) cites inapposite case law in arguing that the amount is unreasonable, and (3) fails to make a claim or cite supporting evidence of the number of hours that would be reasonable or provide evidence of a different usual- and-

customary fee rate. Lastly, Harding County refutes the Department's assertion that the County's counsel was unsuccessful and highlights rulings in the County's favor.

**{45}**    We note at the outset that the Department misquotes the Order for Fees and Costs in that the order does not use the phrase "knowing counsel charged high hourly rates." We note also that the district court necessarily considered certain factors related to the reasonableness of Harding County's counsel's fees when the Department presented them during the hearing.

**{46}**    "Where there is an appropriate civil contempt, the sanction itself is reviewed for an abuse of discretion." *Mercer-Smith*, 2019-NMSC-005, ¶ 19. "An abuse of discretion occurs when the court's ruling is clearly against the logic and effect of the facts and circumstances of the case or is based on a misunderstanding of the law." *Id.* (internal quotation marks and citation omitted). "[E]ven when we review for an abuse of discretion, our review of the application of the law to the facts is conducted de novo. Accordingly, we may characterize as an abuse of discretion a discretionary decision that is premised on a misapprehension of the law." *N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶ 7, 127 N.M. 654, 986 P.2d 450 (alteration, internal quotation marks, and citations omitted).

**{47}**    A court exercising its civil contempt power may impose compensatory sanctions, including damages or attorney fees, "for the purpose of compensating a party for pecuniary losses sustained due to the contempt." *Mercer-Smith*, 2019-NMSC-005, ¶ 22 (internal quotation marks and citation omitted). However, when the state is the party sanctioned, the power should be exercised "sparingly and with circumspection." *State ex. rel. N.M. State Highway & Transp. Dep't v. Baca*, 1995-NMSC-033, ¶ 25, 120 N.M. 1, 896 P.2d 1148. The amount of a compensatory sanction is limited to "the actual loss plus the costs and expenses, including counsel fees, incurred in investigating and prosecuting the contempt." *Tran*, 2018-NMSC-009, ¶ 36 (internal quotation marks and citation omitted). The court may also award costs other than attorney fees incurred in prosecuting a contempt proceeding. *See Spear*, 1996-NMCA-048, ¶ 43.

**{48}**    If an award of attorney fees is made as part of the compensatory sanction, the amount of that award must be reasonable. *See Royal Int'l Optical Co. v. Texas State Optical Co.*, 1978-NMCA-094, ¶ 55, 92 N.M. 237, 586 P.2d 318. We will not disturb a finding of such reasonableness "unless patently erroneous as reflecting an abuse of discretion." *Hertz v. Hertz*, 1983-NMSC-004, ¶ 43, 99 N.M. 320, 657 P.2d 1169 (emphasis, internal quotation marks, and citation omitted). "The test is not what we would have done had we heard the fee request, but whether the [district] court's decision was clearly against the logic and effect of the facts and circumstances before the court." *In re N.M. Indirect Purchasers Microsoft Corp.*, 2007-NMCA-007, ¶ 6, 140 N.M. 879, 149 P.3d 976 (internal quotation marks and citation omitted). Moreover, the already-highly deferential abuse-of-discretion standard "takes on special significance when a court is reviewing fee decisions" because the district court, "intimately familiar with the nuances of the case, is in a far better position to make such decisions" than we,

who "must work from a cold record[,]" are. *Id.* ¶ 14 (alterations, internal quotation marks, and citation omitted).

**{49}** Under these standards, some of the Department's arguments fail. First, the district court ruled that the Department was in contempt. By implication, Harding County was successful in obtaining relief in the context of the contempt proceeding, which is the context in which the award was made. Second, the court assumed the power to award costs once it made the contempt ruling. It therefore had discretion to award the county a sum greater than zero. Third, the law does not limit an award of attorney fees in the context of a contempt proceeding to an amount calculated using a lodestar. Rather, the controlling questions are whether the award exceeds the costs incurred in investigating and prosecuting the contempt and whether the attorney fee amount is reasonable. The Department does not dispute that the award represents costs incurred in investigating and prosecuting the contempt proceeding; instead, it challenges only the reasonableness, considering Harding County's counsel's billing rates and the number of hours billed, of the award amount.

**{50}** In light of the evidence the district court heard on the matter, we conclude that the court did not abuse its discretion in making the award. It received evidence of (1) Harding County's counsel's professional experience; (2) the number of hours required to perform the work in connection with the contempt proceeding; (3) applicable billing rates, which Harding County asserted are its counsel's standard rates; and (4) the Department's vigorous defense in the contempt proceeding. The Department did not rebut this evidence with evidence of what it believed would be a reasonable award under the circumstances of the proceeding. Given the inherent power of a court to impose sanctions on litigants "to regulate their docket, promote judicial efficiency, and deter frivolous filings," *Baca*, 1995-NMSC-033, ¶ 11 (internal quotation marks and citation omitted), the recognition that "a court must be able to command the obedience of litigants . . . if it is to perform its judicial functions[,]" *id.*, and the extraordinary deference we give courts in making such awards, we cannot say that the compensatory sanction in the form of attorney fees and costs against the Department for its contempt was clearly against logic or patently erroneous. We therefore uphold it.

## IV.    The Remainder of the Contempt Order Is Not Reviewable on Appeal

**{51}** Lastly, we address the remainder of the Contempt Order: those parts not pertaining to contempt and the compensatory sanction. The Department asks that we reverse the order. We do not for two reasons.

**{52}** First, aside from (1) the contempt ruling, (2) the finding that the Department willfully and intentionally refused to perform its obligations under the Peremptory Writ, and (3) the order awarding of attorney fees and costs—matters we have already addressed—the Department does not dispute particular findings or conclusions in the order. Having not set forth specific attacks on those elements, we deem them conclusive and the Department's objections to them waived. *See* Rule 12-318(4)

NMRA; *see also In re Estate of Gardner*, 1992-NMCA-122, ¶ 26, 114 N.M. 793, 845 P.2d 1247.

**{53}**  Second, we note that much, if not all, of the remainder of the Contempt Order is not appealable. The Department may not challenge parts of the order essentially restating mandates in the Peremptory Writ, both because the occasion for their review has passed and because they are included in the order only by virtue of the Department's failure to fully comply with the writ. *See United States v. Myers*, 593 F.3d 338, 344 (4th Cir. 2010) ("[A]n individual appealing a contempt order cannot challenge matters other than whether contempt was proper and, *unless earlier appellate review was available*, the order alleged to have been violated." (emphasis added)). Meanwhile, given that the district court, insofar as it reserved the right to impose further sanctions, has not yet exercised that right in a way affecting the Department's substantive rights, we consider the portion of the order reserving those rights non-final for purposes of review. *See* NMSA 1978, § 39-3-2 (1966) (limiting appeals in part to final orders that affect substantial rights of an aggrieved party).

**CONCLUSION**

**{54}**  For the foregoing reasons, we affirm the district court's decision.

**{55}  IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**LINDA M. VANZI, Judge**

**JACQUELINE R. MEDINA, Judge**